STATE of Missouri, Plaintiff–Appellant

v.

Kurt ZANCAUSKE,
Defendant–Respondent.

No. 17115.

Missouri Court of Appeals,
Southern District,
Division Two.

March 7, 1991.

Edward D. Hoertel, Sp. Asst. Pros. Atty., Rolla, for plaintiff-appellant.

L.M. Unterreiner, Asst. Pub. Defender, Rolla, for defendant-respondent.

PARRISH, Presiding Judge.

Kurt Zancauske (defendant) is defendant in a criminal case pending in the Circuit Court of Pulaski County.[1] He is charged with burglary in the second degree. § 569.170.[2] Defendant, by a written motion, moved to suppress "any written statements allegedly made by defendant to any officers of the Phelps County Sheriff's Department on or about March 13, 1989." Following an evidentiary hearing, the trial court sustained the motion. The State of Missouri appeals that ruling as permitted by § 547.200. This court affirms.

■ Although this is "an interlocutory appeal," § 547.200.3, the state has attempted to inject for determination an additional issue to that presented by defendant's written motion to suppress evidence. That additional issue relates to an evidentiary rul-ing made during the course of a trial of this case that ended in mistrial due to a deadlocked jury. Objections to certain oral statements allegedly made by defendant were made at trial, together with an "oral motion to suppress" those statements. The trial court sustained that objection and sustained the "oral motion to suppress." The state seeks to appeal the trial court's ruling as to those oral statements. However, defendant correctly contends that the state has no right to appeal that matter for the reason that no such appeal is authorized by statute.

Section 547.200 permits the state to file an interlocutory appeal from "any order or judgment the substantive effect of which results in: (1) Quashing an arrest warrant; (2) Suppressing evidence; or (3) Suppressing a confession or admission." The Eastern District of this court has held that the suppression of evidence referred to in § 547.200 "relates to those matters properly raised by motion as authorized in Section 542.296, RSMo.1978." *State v. Holzschuh*, 670 S.W.2d 184, 185 (Mo.App.1984).

Section 542.296[3] requires motions to suppress to be in writing and to be made before commencement of trial unless a defendant was unaware of the grounds for the motion before trial or had no opportunity to file the motion to suppress before trial. § 542.296.2 and .3. The state's attempt to appeal the trial court's stated ruling with respect to any oral statements made by defendant fails. "The state may appeal in criminal cases only as provided in section 547.200." *State v. Holzschuh, supra.* The only issue to be addressed is whether the trial court erred in denying defendant's written motion to suppress written statements.

■ In reviewing the trial court's order sustaining defendant's motion to suppress, the facts and inferences that may be gleaned from the record are to be stated

---

1. Defendant's case originated in the Circuit Court of Phelps County. It was transferred to Pulaski County on change of venue.

2. References to statutes are to RSMo 1986 unless otherwise stated.

3. § 542.296, RSMo 1986, is unchanged from § 542.296, RSMo 1978.

favorably to the ruling that is challenged on appeal. *State v. Blair,* 691 S.W.2d 259, 260 (Mo. banc 1985). "The correctness of the trial court's decision is measured by whether the evidence is sufficient to sustain the findings." *State v. Woods,* 790 S.W.2d 253, 254 (Mo.App.1990).

In the course of investigating a reported burglary and stealing that occurred in Phelps County, deputy sheriffs learned that defendant and another man, Joe Dvorak, had been in the vicinity where the offenses occurred. Defendant and Dvorak had been cutting timber on a tract of land near the property where the burglary and stealing took place. They had been cutting timber at that location about the time of the offenses.

At the evidentiary hearing on defendant's written motion to suppress, only one witness testified—John Blair. He had previously been employed as a deputy sheriff and, in that capacity, had participated in the interrogation of defendant on the occasion when the written statement that defendant sought to suppress was given. That interrogation took place March 14, 1989, at the Phelps County Sheriff's Office. Another deputy sheriff had participated in the interrogation, but did not testify at the motion to suppress hearing. Blair testified that the other deputy had talked to defendant "at least a couple times" prior to March 14. However, the evening of March 14 was the first time Blair had talked with defendant. Blair gave no explanation regarding what caused defendant to be at the sheriff's office the evening of March 14, 1989, other than stating that defendant had been asked to be there by the other deputy sheriff. Blair was asked by the assistant prosecuting attorney, "And I take it then that he came of his own free will? He wasn't escorted to the sheriff's department by you or [the other deputy sheriff]?" He responded, "No. He provided his own transportation there."

Defendant's interrogation was conducted in a room at the sheriff's offices identified as the deputy's room. The deputy's room is located on the west side of the building. The doorway into the room is from an open hallway that leads to the front door of the building. It is also accessible from an east entrance to the sheriff's department through a communications room. The interrogation lasted about one and one-half hours.

According to the testimony presented, defendant was not arrested. He was not in handcuffs nor was he restrained from leaving the sheriff's offices. Prior to being questioned, defendant was told that he was not under arrest; "that he'd be leaving regardless of how the interview came out." The door that separated the deputy's room from the hallway was not locked. Defendant was not arrested at the conclusion of the interview.

Joe Dvorak was also at the sheriff's office the evening of March 14, 1989. Defendant and Dvorak were kept apart while they were in the sheriff's offices. Each was questioned separate from the other. At no time during the interrogation was defendant advised of the rights afforded him by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

John Blair summarized the events that occurred during the course of the interrogation as follows:

Q. And when he came in he was not Mirandized, is that right?

A. No, sir, he was not.

Q. Was he a suspect in any way?

A. Absolutely.

Q. He was a suspect.

A. Certainly.

Q. But he came in of his own free will and you asked him to make a voluntary statement, is that right?

A. I asked him to write a statement. I didn't say the word voluntary.

Q. Was it written on a voluntary statement form?

A. Right.

Q. But he wasn't Mirandized and told he was under arrest?

A. No, sir.

Q. Wasn't told he was allowed to be silent or anything like that.

A. No, sir.

Blair testified that during the course of the interrogation, defendant was told that Dvorak had confessed to the crimes and that Dvorak had implicated defendant. Defendant then gave a written statement in which he admitted being at the scene of the crime but denied going into the building that was burglarized. Following further conversations with the deputy sheriffs, defendant admitted entering the premises but denied taking anything.

On May 12, 1989, a felony complaint was filed in the Associate Circuit Judge Division of the Circuit Court of Phelps County alleging that defendant committed the offense of second degree burglary. An arrest warrant issued and bond was set at $7,000. The record on appeal does not show the date of defendant's arrest. It does show, however, that defendant appeared before the Associate Circuit Judge Division of the Circuit Court of Phelps County on May 25, 1989; that a preliminary hearing was then scheduled for June 14, 1989; and that defendant, when he appeared on May 25, 1989, was committed to jail for failure to post bond. The legal file shows that bond was filed in that court June 2, 1989.

The issue presented by this appeal is whether the interrogation of defendant was a "custodial interrogation" so that the procedures required by *Miranda v. Arizona,* *supra,* were required to be followed. In *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612, the U.S. Supreme Court stated:

> Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way [footnote deleted]. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

The footnote referenced in the material above quoted states, with regard to the explanation given of "custodial interrogation," "This is what we meant in *Escobedo* [*v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)] when we spoke of an investigation which had focused on an accused."

In this case the trial court found that defendant's statement was the product of a custodial interrogation. In stating the ruling on the motion to suppress, the trial judge said:

> I do believe the essential element is, was there a custodial interrogation going on, and that if there was a custodial interrogation, then I believe that it is still the state of the law that the Miranda rights must be given to the defendant. Now the case provided indicates that the mere coming to the police station in and of itself does not establish a custodial interrogation. The point that is very troubling to me in what happened in this case, other than the time factor which is thirty minutes to an hour to an hour and a half, comparing the cited case [*Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)] and the facts in this, is that the defendant first denied that he was involved in this matter. The other person was then questioned and at that time that person admitted they were involved in it. The police officers then clearly knew at that point in time that the defendant was a major suspect in the case, brought him back into the room, interrogated him, indeed, confronted him with the fact that the confession had been made.... However, the Court is going to have to rule that this was a

custodial interrogation at the time the defendant made his statements.

In contending that no Miranda warning was required, the state relies on *Oregon v. Mathiason, supra*, as it did in opposing the motion to suppress in the trial court. In *Mathiason*, the criminal defendant was a parolee who the owner of a house that was burglarized had named when asked if she suspected anyone. He was a "close associate" of her son. After failing to contact Mathiason on three or four occasions, a police officer left his card at Mathiason's place of residence with a note for Mathiason to call him. Mathiason called and agreed to meet with the police officer. He was to go, and did go, to the state police office. That office was about two blocks from Mathiason's residence. Mathiason went there at 5:00 p.m., about an hour and a half after his telephone conversation with the police officer.

When Mathiason arrived at the state police office, the officer met him in the hall, shook hands and took him into an office. Mathiason was told that he was not under arrest, but that the officer wanted to talk to him about a burglary. The police officer told Mathiason that he believed Mathiason was involved in the burglary. Mathiason, after sitting for "a few minutes," admitted the offense. This occurred within five minutes after the officer had taken Mathiason into the office. The officer then advised Mathiason of his Miranda rights and took a taped confession. Mathiason was not arrested at that time. He left the state police office at about 5:30 p.m., approximately thirty minutes after his arrival. Criminal charges were later filed. Mathiason was tried before a court sitting without a jury and found guilty. Mathiason contended at trial and on appeal of his case that his confession should be suppressed "as the fruit of questioning by the police not preceded by the warnings required in *Miranda v. Arizona.*" 429 U.S. at 492, 97 S.Ct. at 712.

In a summary disposition, the Supreme Court found, by per curiam opinion, that there was no indication that the questioning took place in a context where Mathiason's freedom to depart was restricted. The court concluded "that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.'" 429 U.S. at 495, 97 S.Ct. at 714.

A similar result was reached in *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). As in *Oregon v. Mathiason, supra, Beheler* was a summary disposition in which the U.S. Supreme Court issued a per curiam opinion. The court, in *Beheler*, stated the question presented in that case as follows:

> The question presented in this petition for certiorari is whether *Miranda* warnings are required if the suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police *after a brief interview.* (Emphasis added).

463 U.S. at 1121, 103 S.Ct. at 3517.

In *Beheler*, the defendant, Jerry Beheler, and several other persons attempted to steal hashish from a woman who was selling the controlled substance at a liquor store parking lot. When the woman resisted, she was killed by two of the participants. A short time later, Beheler called the police "who arrived almost immediately." Beheler told the police the identity of a person (a companion of Beheler's) who Beheler claimed had killed the victim; reported that his companions had hidden the gun in his back yard and consented to a search of the back yard. The gun that was used in the killing was found. Later that evening, Beheler voluntarily agreed to go to the police station. He was told he was not under arrest.

At the police station, Beheler agreed to talk to the police about the murder. Beheler was not advised of his Miranda rights. The interview lasted less than thirty minutes.[4] He was then permitted to leave. Five days later Beheler was arrested. He

---

**4.** The opinion does not indicate what statements, if any, Beheler made to the police during

the course of the interview at the police station.

was then advised of his Miranda rights after which he gave a second taped confession. In that confession, Beheler admitted that his earlier interview with police, in which he had made statements relative to the offense, had been voluntary.

In the case now on appeal, the state argues that during the time the defendant was at the sheriff's office, his freedom was not restricted to an extent that he was rendered "in custody." The state says that the defendant was not subjected to custodial interrogation and, as in *Mathiason,* no Miranda warnings were required, thereby making any statements defendant gave admissible against him at trial. The state further points to *State v. Greathouse,* 627 S.W.2d 592, 594 (Mo.1982), as authority for the proposition that a statement freely given by a person at a sheriff's office, but not under arrest or otherwise restrained of his liberty, is admissible albeit Miranda warnings were not given.

In *Greathouse* a nephew of a missing man with whom the nephew lived, and who the nephew referred to as "dad," accompanied a deputy sheriff to the sheriff's office to assist the deputy in telephoning "the details of [the missing uncle's] absence to the Highway Patrol in Willow Springs for broadcast over their radio." *Id.* at 593. The nephew was told he did not have to go with the deputy sheriff unless he wanted to go. The nephew told the officer he would go. At the sheriff's office, the deputy sheriff told the nephew that the deputy had to first assist with feeding prisoners in the jail. Before that deputy sheriff returned, another deputy, Deputy Sheriff Jenkins, arrived at the office, went to the nephew, told the nephew that he (Jenkins) had been a good friend of the boy's "dad" a long time and expressed concern about the missing man. Jenkins asked the nephew to tell him where they could find the uncle. Deputy Sheriff Jenkins said to the nephew, "I'd like for you to tell me where we can find your dad because ... [t]hat woman he went off with could have killed him or something." *Id.* at 594. The nephew broke down crying saying, "Lester, I shot him. I killed him and took him over on UU Highway." Deputy Sheriff Jenkins left

the room. The deputy sheriff who had brought the nephew to the sheriff's office was told what had occurred. That deputy returned to the nephew, read his Miranda rights to him and took his statement.

In *Greathouse* the court pointed out, "By necessary implication, custodial interrogation does not exist where the person questioned is not in custody because he is not even a suspect in the crime, [citations omitted], or, even assuming that he was a suspect, where he is not under arrest or otherwise restrained of his liberty. [Citing *Oregon v. Mathiason* ]." *Id.* The court noted that both of the circumstances it identified were absent in the case.

*Greathouse* is readily distinguishable from the case on appeal. In *Greathouse* that defendant was not a suspect. In this case the defendant was a suspect at the time he went to the sheriff's office. Additionally, once the defendant in *Greathouse* became a suspect—when he told Deputy Sheriff Jenkins that he had shot his uncle—that defendant was given the Miranda warning before he was interrogated about the offense.

In *Greathouse, Mathiason* and *Beheler,* the Miranda warning was given at the time the criminal investigations had developed evidence that focused on the respective defendants. Once evidence was developed, the Miranda warning was given before proceeding to make further inquiries of those defendants. In *Mathiason* and in *Greathouse,* the Miranda warning was given promptly following the first incriminating statement of each defendant. In *Mathiason* this occurred within five minutes after that defendant had arrived at the state police office. In *Greathouse* the officer to whom defendant unexpectedly confessed immediately left the room. A second deputy came into the room and promptly read the Miranda warning to the defendant, then took his statement.

In *Beheler* that defendant was the one who first summoned police to the scene of the crime in which he had participated. Later in the evening, Beheler went to the police station knowing he was not under

arrest. The police interviewed him. The opinion in *Beheler* is silent as to the nature of the interview. It does not indicate the extent, if any, that Beheler's statements were incriminatory either at the police station or earlier at the crime scene. Five days later, however, when Beheler was arrested, the police did advise Beheler of his Miranda rights. In a statement *made after* being advised of his Miranda rights, Beheler admitted that his prior statements were made voluntarily.

Also, in *Mathiason* and in *Beheler* the interviews that occurred prior to the giving of the Miranda warning lasted "½-hour" in *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714, and "less than 30 minutes" in *Beheler*, 463 U.S. at 1122, 103 S.Ct. at 3518. In this case, the defendant was at the sheriff's office in an interrogation setting for an hour and a half during which sheriff's deputies alternated between two suspects (of which defendant was one) in different locations, using information obtained from one suspect to confront the other. Unlike in *Mathiason* and in *Beheler*, the defendant in this case was not given a Miranda warning during the course of the interrogation when the interrogating officers developed evidence clearly implicating him in the crime. The interrogation of this defendant continued without him being advised of his Miranda rights.

In *State v. Micheliche*, 220 N.J.Super. 532, 533 A.2d 41 (1987), and *State v. Raymond*, 305 Minn. 160, 232 N.W.2d 879 (1975), two other states addressed the issue that is presented in this case, viz., when does an interrogation of a suspect at a police station become custodial? Those cases are similar to *Mathiason* and *Greathouse* in that in *Micheliche* and *Raymond* noncustodial interrogations were in progress when, in each case, the person being questioned "blurted out" an admission that he committed the criminal act being investigated. In *Micheliche* the person being questioned was a suspect. In *Raymond* the person being questioned was not. Both interrogations occurred at police stations. Neither of those defendants was under arrest at the time the interrogations commenced. In *Micheliche* the incriminating statement was made approximately three hours after the declarant had voluntarily consented to answer questions. The court held in *Micheliche*, 533 A.2d at 43–44, that until the defendant stated his admission of the crime, the interrogation was noncustodial in accordance with *Oregon v. Mathiason, supra*, but thereafter it became custodial. Because the Miranda warning was promptly given when the investigation became custodial, the defendant's statements given both before and after the Miranda rights were explained were admissible evidence.

In *Raymond*, 232 N.W.2d at 884, the court, in a distribution of controlled substance case, explained the effect of not giving the Miranda warning immediately following that defendant's admission of guilt, saying:

> It should be noted that defendant was not asked a specific question when, on his own initiative, he blurted out, "Well, I suppose I better tell you. He did get it from me." We feel that prior to this admission suspicion had not begun to focus on this defendant as a suspect for a particular crime. Without this element of suspicion, no warnings were needed. [Citation omitted.] At the point of the crucial admission, the Miranda warnings should have been given. Thus, the statements made immediately after this admission clearly should be excluded and the trial court ruled correctly as to these statements. However, the admissions and the questions and answers which had preceded it are admissible.

The court in *Raymond* went on to find that statements given at a later date, after appropriate Miranda warnings, were "not tainted as derivative of that portion of the statement improperly obtained on [the earlier date]." [5] 232 N.W.2d at 887.

---

**5.** The later statements in *Raymond* were excluded on other grounds. *State v. Raymond*, 232 N.W.2d at 887.

As was acknowledged in *California v. Beheler*, 463 U.S. at 1125, 103 S.Ct. at 3520, the circumstances in each case influence a determination of whether a person is "in custody" in order to determine if the Miranda warning is required. In *Beheler* the court explained, nevertheless, that "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest. [Citing *Mathiason*, [429 U.S.] at 495, 97 S.Ct. at 714]."

In this case, the circumstance surrounding defendant's interrogation that makes it difficult to apply the language of *Beheler* and *Mathiason* is the unusual position taken by the sheriff's personnel with respect to their reason for trying to solve the crime they were investigating. The deputy sheriffs, although they suspected the defendant of the burglary and stealing offenses they were investigating, undertook to solve the crime in order to recover property that had been reported stolen rather than to attempt to bring criminal charges against the guilty parties. At the evidentiary hearing on the motion to suppress, only one of the deputy sheriffs who had participated in the interrogation of the defendant testified. On cross-examination, the former deputy sheriff was asked the following question and gave the following answer:

Q. And did you instruct Mr. Zancauske that if items were recovered, charges would not be brought?

A. I told him that night that as far as we had learned, the man just wanted his property back, that's correct.

At some later time, after they had obtained statements from defendant and from Dvorak, the law enforcement officers of Phelps County resumed the performance of the duty of charging suspects who they had reasonable cause to believe had committed crimes with the commission of those crimes. A criminal charge was filed against the defendant in this case.

This case illustrates the dilemma that was posed in a footnote to a dissenting opinion in *Mathiason*. There, Mr. Justice Marshall opined, "I trust today's decision does not suggest that police officers can circumvent *Miranda* by deliberately postponing the official 'arrest' and the giving of *Miranda* warnings until the necessary incriminating statements have been obtained." *Mathiason*, 429 U.S. at 499 n. 5, 97 S.Ct. at 716 n. 5 (Marshall, J., dissenting).

It is our opinion that Miranda cannot be circumvented in this manner. *Mathiason* and *Beheler* are cases in which suspects made admissions of guilt to police officers in the course of interrogations at police stations that were not custodial at the times the initial admissions were made. However, in each of those cases, at the time the police officers focused on the respective suspects—immediately in the case against Mathiason and five days later in the case against Beheler (who later, after being advised of his Miranda rights admitted that his earlier statements were given voluntarily)—the Miranda warnings were given before attempting to elicit further statements. This was when, in each of the cases, the police had reasonable grounds to believe that a crime was committed and reasonable grounds to believe that the defendant committed it. This is consistent with this court's holding in *State v. Pierce*, 556 S.W.2d 216, 218 (Mo.App.1977).

In discussing when custodial interrogation begins, this court, in *Pierce, supra*, quoted from *State v. Tellez*, 6 Ariz.App. 251, 431 P.2d 691, 696 (1967), which stated with regard to *Escobedo v. Illinois, supra*, and *Miranda, supra*:

To put the matter in familiar terms, the police must have both reasonable grounds to believe that a crime has been committed, and also reasonable grounds to believe that the defendant is the one who committed it. [Citation omitted.] We believe that the point where the warning must be given is when the two generally coincide, for from that point forward the police can be expected to pursue the case against the defendant with vigor. The police must have focused generally upon the crime so that they would have cause for arrest without a warrant ... The time for caution is when the arrest could be made. Every-

thing prior to that time may reasonably be considered "the general on the scene questioning" which is permissible....

After this quotation from *Tellez,* this court added, "With this we agree." It concluded, under the facts of *Pierce,* that the Miranda warning had properly been given at the time a deputy sheriff involved in that case had reasonably begun to suspect that defendant and had developed evidence that constituted probable cause for that defendant's arrest.

■ In this case, the defendant, Kurt Zancauske, was a suspect at the time he appeared at the sheriff's office, at the request of a deputy sheriff, for interrogation. During a one and one-half hour interrogation that involved deputy sheriffs going between the room where Zancauske was being questioned and another where the suspected co-conspirator, Joe Dvorak, was being questioned, defendant was informed that Dvorak had implicated him in the crime being investigated. The officers who were investigating the crime and who were interrogating the defendant had reasonably begun suspecting that the defendant committed the crime prior to the interrogation. However, it was when Dvorak admitted the crime and implicated defendant that the evidence the law enforcement officers had developed constituted reasonable grounds for arrest. At that point the interrogation became custodial notwithstanding that defendant had been told at the outset of the interrogation that he was not under arrest and was free to leave regardless of the outcome of the interrogation. That was the point when "the police [could] be expected to pursue the case against the defendant with vigor." *State v. Pierce, supra,* at 218. It was then that the Miranda warning was required. However, the Miranda warning was still not given. Thereafter, during further interrogation, defendant made incriminating statements, including the written statement to which the motion to suppress that is the subject of this appeal is directed. The trial court had sufficient evidence to find that those statements were the product of a custodial interrogation which was not conducted in accordance with the procedures required by *Miranda v. Arizona, supra.*

The trial court's order sustaining defendant's motion to suppress was supported by sufficient evidence. The order of the trial court sustaining the written Motion to Suppress Statements in case no. CR590–1FX in the Circuit Court of Pulaski County is affirmed.

FLANIGAN, C.J., and SHRUM, J., concur.