STATE of Missouri, Respondent,

v.

Kenneth G. MIDDLETON, Appellant.

Kenneth G. MIDDLETON, Respondent,

v.

STATE of Missouri, Appellant.

Nos. WD 46165, WD 44671.

Missouri Court of Appeals,
Western District.

April 6, 1993.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 1, 1993.

Application to Transfer Denied
June 29, 1993.

Robert G. Duncan, Gerald M. Handley, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ULRICH, P.J., and BRECKENRIDGE and HANNA, JJ.

HANNA, Judge.

In February 1991, Kenneth G. Middleton was convicted by a jury of murder in the first degree and armed criminal action. In accordance with the jury's assessment of the punishment, the court sentenced the defendant to life imprisonment without probation or parole for murder in the first degree and to 200 years for armed criminal action. The sentences were ordered to run concurrently. The defendant appeals his criminal conviction and the denial of his Rule 29.15 motion. The judgments are affirmed.

■ The defendant first complains that his motions for judgment of acquittal for the convictions of murder in the first degree and armed criminal action should have been sustained because he was convicted on circumstantial evidence, which did not exclude death either by suicide or accident. The answer to this contention requires a close review of the evidence.

■ When reviewing the sufficiency of the evidence, the appellate court will consider all substantial evidence and inferences in a light most favorable to the verdict, and will reject all contrary evidence and inferences. *State v. Naucke*, 829 S.W.2d 445, 459 (Mo. banc 1992) *cert. denied*, — U.S. —, 113 S.Ct. 427, 121 L.Ed.2d 348 (1992). This court will neither weigh the evidence, *State v. Villa–Perez*, 835 S.W.2d 897, 900 (Mo. banc 1992), nor will it determine the reliability or credibility of the witnesses, *State v. Hamilton*, 817 S.W.2d 8, 11 (Mo.App.1991); but will limit its review to a determination of whether there existed substantial evidence from which the jury might have found the defendant guilty beyond a reasonable doubt. *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989).

The evidence presented to the jury, stated favorably to the verdict, showed that on February 12, 1990, Katherine Middleton was at work at AT & T in Lee's Summit, Missouri, when she received a phone call from her husband, the defendant, who complained of illness. She left work and drove home.

Approximately twenty minutes later, at 1:52 p.m., the 9–1–1 dispatcher received a call from the defendant requesting an ambulance. The defendant told the dispatcher, "A gun just went off and hit my wife ... [i]n the side of the head." Within three minutes, a second call was received by the

9-1-1 operator. The caller told the 9-1-1 operator, "There wasn't supposed to be anything in it. Oh God." While they conversed, police officer John Gale arrived at the Middleton residence located in Blue Springs, Missouri.

As Officer Gale arrived, the defendant came out of the house appearing "real frantic," which caused the officer to draw his gun. The defendant was yelling and asking where the paramedics were. When Officer Gale realized the defendant was unarmed, he holstered his gun and asked the defendant what had happened. The defendant did not answer, but instead kept yelling, "Where are the paramedics?"

It was a bright, sunny day but the blinds in the house, which were almost always open, were drawn and the inside of the house was dark. Upon entering the house, Officer Gale looked into the dining room and saw the victim, Mrs. Middleton, lying in a pool of blood on her right side. She had a bullet wound above her left eye with an exit wound on the right side of her head. He testified that it was apparent she had not been breathing for several minutes.

When Officer Gale returned to the defendant in the living room, he tried to determine what had happened. He asked if his wife had committed suicide, and the defendant replied she had not. The defendant explained that he had been sick and had called his wife home from work. While he waited for her, he was cleaning his Smith & Wesson .357 Magnum. He explained that when his wife got home, she picked up the gun, started to walk to the other room, dropped the gun and it went off.

Officer Spartz and Sergeant Collier arrived about this time and observed the .357 Magnum lying on an ottoman. The defendant said he had picked it up and placed it there. One officer inspected the gun and found five shells and one empty cylinder. The firing pin was depressed on one of the shells, indicating it had been fired. The bullets were jacketed, hollow-point shells, designed to "mushroom back" or expand when they enter the target.

Because the defendant was acting "explosive," Officer Spartz hid the gun behind the television set. The defendant appeared agitated, continuing to yell and flail his arms. This activity caused the officer to pat him down to make sure he did not have another weapon. Immediately following the pat down, the defendant acted surprised, became rigid, and screamed that he was going to be sick. He ran down the hallway to the bathroom. Officer Spartz followed him and saw that he was washing his hands in the sink. Both Spartz and Gale twice told the defendant to get his hands out from under the water. They finally had to pull him out. The officers did not see the defendant vomit or stand over the toilet. They did see him spit saliva into the sink.

The defendant used a hand towel to dry his hands. Officer Spartz took the defendant outside to the garage and tried to calm him down and asked him to explain exactly what happened. The defendant repeated what he had said before, except in more detail. He told the officer he had taken some pills that morning for an infection, and began sweating and feeling ill. He called his wife to come home from work and when she arrived, she told him he looked ill and said she was going to call the doctor. She took the gun the defendant was cleaning and as she walked to the telephone, she dropped the weapon. The defendant explained that when the gun fell to the floor it went off in her face. At this point, the defendant threw up his hands and banged them against the garage door.

During the time the defendant was outside with Officer Spartz, Officer Gale looked for some indication that the defendant had been cleaning his gun. He found no evidence substantiating defendant's explanation, except for a towel upstairs. He later found a gun box and some brushes in the basement.

Paramedics Keebaugh and Wedlock arrived and determined the defendant was hyperventilating, complaining of chest pains, and his blood pressure was slightly elevated. They convinced the defendant to allow them to transport him to the hospital for an examination. As the paramedics prepared to transport him, the defendant

reached his hands into a flower planter and began rubbing his hands in the dirt. At some point after this and before the defendant was taken to the hospital, the police performed a paraffin test on his hands.

Officer Spartz rode in the ambulance with the defendant and again asked him "... to be clear as to what exactly had happened in the house." The defendant narrated the events up to the point where his wife was walking to the telephone. He abruptly stopped and closed his eyes in a manner described by the officer as "squinting" and appeared unconscious. This surprised the paramedic and caused him to perform some tests to determine defendant's medical condition. When the ambulance arrived at St. Mary's Hospital in Blue Springs, the defendant continued to appear unconscious.

Officer Spartz positioned himself at the nurses' station and was able to observe the defendant in his room. When no one was in the room, the defendant would open his eyes and look around, but when someone came in, he would shut them. Eventually, he began to interact with hospital personnel. The police officer went into the room and the defendant agreed to resume telling the events that had taken place earlier that day. On this occasion, he described the death of his wife as follows. She came in and told him she was going to call the doctor and went to the telephone. He was sitting in the chair wiping his gun off when he got up to hand her the gun. He related that he was unsure whether he "fell back or what," but he next woke up on the floor. His wife was lying on the floor.

An autopsy showed that Mrs. Middleton was 5'6" and weighed 128 pounds, and had a single gunshot wound to the head, which the medical examiner testified was the cause of death. The entry point was above the left eye, 3½" below the top of her head. The exit point was on the right side, 2½" below the top of her head. There was a prominent area of powder stippling, i.e., small dots, present around the left side of her face over an area measuring 4½" × 4".

The medical examiner testified to multiple contusions on her upper chest, which were caused by a blunt trauma. The bruises were described by the examiner as consistent with someone of the defendant's size (6 feet tall, 200 pounds) "grabbing the woman by the blouse and pressing her against a wall."

The defendant complains that the evidence was not sufficient to sustain the convictions, that the police failed to warn him of his *Miranda* rights, and requests plain error review of the admissions of certain evidence, and instructional errors. Finally, the defendant advances his Rule 29.15 claim of ineffective assistance of counsel.

On the question of the sufficiency of the evidence, the defendant argues that the evidence did not exclude the "possibility" of an accidental shooting or suicide, citing *State v. Priest*, 660 S.W.2d 300 (Mo.App. 1983), and *State v. Black*, 611 S.W.2d 236 (Mo.App.1980). The defendant argues that the state could not make a submissible case and therefore, sought to make its case by discrediting the defendant's explanation of the events leading to his wife's death.

In order for the state to sustain a conviction of murder in the first degree, it must prove the following beyond a reasonable doubt:

> A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberating upon the matter.

§ 565.020.1, RSMo.1991.

The elements of the crime may be shown by direct or circumstantial evidence, but in either event, the state bears the burden to prove the criminal agency of the defendant beyond a reasonable doubt. *State v. May*, 689 S.W.2d 732, 735 (Mo.App. 1985). The corpus delicti of a homicide is not established unless the proof shows that the death was not self-inflicted, from natural cause, or by accident. *Id.*

A conviction may rest solely on circumstantial evidence when the facts and circumstances relied upon to establish guilt are consistent with each other, consistent with the guilt of the defendant and inconsistent with any reasonable theory on his

innocence.[1] The state's burden does not require it to exclude the impossibility of innocence and the mere existence of other possible hypotheses does not take the case from the jury. *State v. Fears*, 803 S.W.2d 605, 608 (Mo. banc 1991).

Defendant's own testimony as well as other physical and direct evidence ruled out suicide, which we will not review because nothing suggests suicide, and the defendant does not seriously contend his wife took her own life. Our review of the sufficiency of the evidence will be directed to defendant's contention that the shooting was accidental.

The prosecution's theory was that the defendant grabbed his wife, pushed her up against the wall, raising her slightly, and killed her with a single shot to the head. A Regional Crime Laboratory chemist measured the blood spattered on a section of the wall board, which had been removed from the Middleton residence. The blood spattering was 5'6" from the floor, indicating that he had pushed her up as he shot her. (Mrs. Middleton was 5'6" tall and the entry wound was above her left eye, about 3½" below the top of her head). The fresh bruises found on the upper part of her chest were explained by the prosecution as the marks left when he held her up against the wall.

A firearm and tool mark examiner testified that a boot impression in the sheetrock wall appeared to be made by one of the defendant's boots. This is consistent with the state's theory that he used his foot and leg to help hold her.

The empty shell casing from the .357 Magnum and the bullet were recovered from the crime scene and both were determined to have been fired by this gun. There was expert testimony that the stippling pattern on the victim's forehead indicated that the muzzle of the gun was about a foot away from the victim's face when it was fired.

The firearm and tool mark examiner testified that the two safeties on the gun would prevent it from discharging accidently, even if the hammer were cocked. He explained that the trigger must be held back for the gun to fire and the safety devises appeared to be working properly. Dropping the gun repeatedly from heights of five, four and three feet did not cause the gun to fire. If the gun were cocked, it would take 3½ pounds of trigger pressure to fire and, if not cocked, it would require 10½ pounds of trigger pull.

Additionally, the state presented evidence of the defendant's deceptions. The defendant's two different versions of the shooting, neither of which was consistent with the physical evidence, demonstrated a consciousness of guilt and bears directly on the issue of guilt or innocence. *State v. Rodden*, 713 S.W.2d 279, 290 (Mo.App. 1986). His attempt to eliminate any evidence of gunshot residue from his hands, before the police administered a paraffin test, displays a consciousness of guilt. *State v. Turner*, 633 S.W.2d 421, 424 (Mo. App.1982).

The facts of this case are unlike those found in *Priest* or *Black*. The defendant's hypothesis of an accidental shooting remains, at best, merely a possibility, and therefore, not sufficient to allow the court to sustain his motion for judgment. The evidence was not two equally valid inferences; one of his guilt and one of his innocence. The facts and circumstances are consistent with each other and with the guilt of the defendant, and they are inconsistent with any reasonable theory of the defendant's innocence. The point is denied.

During the events that took place at the defendant's residence, as well as en route to and at the hospital, the defendant was never formally arrested, nor was he given his *Miranda* rights.[2] In separate interviews at the house, only a few minutes apart, the defendant gave two statements,

---

**1.** It is questionable how long the requirement will remain obligating the prosecution to exclude every reasonable hypothesis except guilt. Our Supreme Court has acknowledged that the case for rejecting this standard of review is persuasive, and that the time for its rejection may come. *Villa–Perez*, 835 S.W.2d at 900 n. 2.

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

which were factually similar and were admitted into evidence. The defendant's actions and silence during the ambulance ride to the hospital were used against him, as was a third statement given at the hospital. The defendant's principal contention in his next two points, and their subparts, is whether his statements and his silence in the ambulance were the product of a "custodial interrogation." He maintains the trial court erred in denying his motions to suppress these statements. Therefore, he argues, his statements were rendered inadmissible by the officers' failure to advise him of his *Miranda* rights.

Defendant makes a two-pronged argument that he was in custody: (1) either he was in actual custody or "a reasonable person in the suspect's position would have understood his situation" to be one of custody, citing *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir.1990) or, alternatively, (2) he contends that although he had not been formally arrested, the focus on him as a suspect had intensified to an extent that the *Miranda* warning was required. He cites *State v. Lynn*, 829 S.W.2d 553 (Mo.App.1992) and *State v. Zancauske*, 804 S.W.2d 851 (Mo.App.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 73, 116 L.Ed.2d 47 (1991), as support for his second argument. The state responds that Missouri case law interpreting *Miranda* requires a warning only upon a formal arrest or a restraint on the suspect's freedom of movement of a degree associated with a formal arrest. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After a hearing, the trial court denied the motion to suppress the statements.[3]

The defendant advances the following as factual support for his position that he was in actual custody or under like restraint: (1) when the first police officer arrived at the home and found defendant in the front yard, the officer pulled his weapon; (2) later the police removed the .357 Magnum from the presence of the defendant and hid it; (3) Officer Spartz did a pat-down search of the defendant for weapons; (4) Officer Gale's written report said the defendant was in custody within a couple of minutes of the officer's arrival; (5) the officers followed the defendant to the bathroom and ordered him to stop washing his hands and when he refused, they pulled him away from the sink; (6) Officer Spartz escorted the defendant outside and questioned him by the garage; and (7) Officer Spartz was directed to accompany the defendant when he was placed in the ambulance. Alternatively, the defendant continues, these facts make it clear that the focus of the investigation was on him, thereby causing him to be the subject of a custodial investigation requiring a *Miranda* warning.

■ With respect to the defendant's assertion that when he ran into the front yard he was faced with a police officer with his gun drawn, the testimony described the defendant as being in a hysterical state. The testimony clearly explained that the officer readied his weapon for his own protection. Later events confirmed that it was not the intent of the officer to arrest the defendant. Once it became apparent that the defendant was not armed, the officer reholstered his weapon.

The officers arrived on the scene of a shooting where an individual had been killed and the survivor was in a highly agitated condition. It is expected that they should exercise caution for their own safety. Patting-down the defendant, hiding the .357 Magnum behind the television, keeping him under observation by following him to the bathroom and accompanying him outside were actions designed to protect their own safety. Further, the officers were obligated to investigate the shooting, which included the preservation of evidence such as gunpowder residue which could be on the hands of the only survivor at the scene of a shooting.

The officer's written report that the defendant was in custody was a conclusionary statement. It was no more determinative or binding on the court's decision that defendant was in custody than if the report had said he was not in custody. The court

---

**3.** The trial court did suppress statements made at a later date at the police station.

had the discretion to give whatever weight, if any, it chose to that statement.

The defendant was never formally arrested, handcuffed, taken into custody, or restrained of his freedom to move at will within the house or at any other time until he was arrested a number of days following his second hospital stay. The police were at the residence as a result of the defendant's 9–1–1 call. With the exception of several temporary and minimal restraints, the defendant was free to move about without restraint. No one forced him to be transported to the hospital; for his own well-being, the paramedics suggested he go and he consented. There is no evidence of strong-arm tactics, deceptions or trickery to obtain incriminating statements. The police questions were straightforward. They simply asked the defendant, who was a primary source of information, to explain what occurred. Finally, the facts do not indicate a police-dominated atmosphere. Certainly, there were occasions when the defendant was restrained but these restraints were minimal, temporary and were necessary either for the officers' protection, concern for Mr. Middleton's safety or the preservation of evidence.

■ Coercive police activity is the necessary predicate to finding any statement involuntary and, therefore, inadmissible. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). These restraints, limited and temporary, did not amount to a restraint on the defendant's freedom of movement or coercive police activity to a degree that required the *Miranda* warning. The coercive aspects of a custodial interrogation were not present. We hold that at the time these statements were given, the defendant was neither formally arrested nor restrained of his freedom of movement of a degree associated with a formal arrest.

Further, the activities at the house constituted an on-the-scene investigation. *Miranda* makes exception for investigatory questions by the police. *State v. McNorton*, 748 S.W.2d 690, 691 (Mo.App.1988).

In *Miranda*, the United States Supreme Court states:

> Our decision is not intended to hamper the traditional function of police officers in investigating crime.... *General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.* It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement.

*Miranda*, 384 U.S. at 477–78, 86 S.Ct. at 1629–30 (emphasis added).

■ The defendant continues his argument that the *Miranda* warning was required by the events in the ambulance and at the hospital. He contends that a *Miranda* warning was required in the ambulance because the trial court allowed the state to infer guilt from his silence (i.e. he faked unconsciousness in the ambulance following the police officer's question in order to avoid answering). Further, he argues a *Miranda* warning was required at the hospital when he made his third statement about the shooting. The defendant argues that both matters should have been excluded because a *Miranda* warning was an unaccomplished prerequisite. Defendant insists the paramedic was an extension of the police in the interrogation process. (As part of this point, the defendant repeats his reliance on *Lynn* and *Zancauske*, maintaining he was the "focus" of the police investigation. This issue is taken up later in the opinion.)

It is defendant's position that the paramedic, Wedlock, conducted tests after the defendant appeared unconscious, acting as an extension of the police for the sole purpose of allowing Officer Spartz to question him. Therefore, the defendant contends, his silence should not have been admissible.

In the ambulance, the defendant was relating the events of the incident, when he closed his eyes and abruptly stopped his statement at the point where his wife had picked up his revolver and headed out of the room. The sudden unresponsiveness surprised the paramedic, and in accordance

with standard practice, he conducted a series of tests. He rubbed the defendant's sternum to obtain a response (the defendant flinched), pinched the defendant's arm (he flinched again), tried to insert a plastic tube into the defendant's mouth to create an oral airway (the defendant gagged and spit it back out), placed an ammonia capsule under the defendant's nose (he pursed his lips and blew the capsule across the ambulance), and finally, held the defendant's arm over his head and released it. If a person is unconscious, the hand will strike his face. The defendant twice moved his hand as it fell so that it struck the top of his head, rather than his face. The responses caused the paramedic to conclude that the defendant was feigning unconsciousness.

These were standard tests legitimately conducted to evaluate the defendant's medical condition. There was substantial evidence allowing the trial court to conclude that when the tests were administered by the paramedic, the defendant was not in custody, was not being questioned, and the paramedic was not acting on behalf of the police officer. There is no evidence, except unbridled speculation, supporting defendant's theory that the tests were done in order for the officer to continue questioning the defendant. Defendant's pre-arrest silence is admissible as a tacit admission. *State v. Lawrence,* 569 S.W.2d 263, 265 (Mo.App.1978).

The statement that defendant made at the hospital was in more detail than the previous two he had given. At the hospital, when the officer noticed that the defendant had begun to interact with hospital personnel, he went into his room. The defendant agreed to continue talking to him. After the preliminary details, the defendant stated, as related by the police officer: "And he had—he was sitting there in the chair, wiping his gun off, and he got up to hand her the gun. *He doesn't know if he fell back or what, but the next thing he knows, he woke up on the floor or he was on the floor and she was on the floor also."* (emphasis added)

The fact that the questioning occurred at the hospital does not necessarily determine, that there was custodial interrogation. *State v. Schnick,* 819 S.W.2d.330, 334 (Mo. banc 1991); *State v. Swingler,* 632 S.W.2d 267, 272 (Mo.App.1982). When the interview took place, the defendant was not at the mercy of the officer nor was he deprived of his freedom of action to any degree by the police officer. All evidence and inferences were that the defendant could have terminated the interview at any time and directed the officer to leave. The coercive aspects of a custodial interrogation were not present. *Schnick,* 819 S.W.2d at 334. The hospital setting and the facts related to the officer's question did not transform itself into a custodial interrogation.

■ A bit more troublesome is whether the police are required to give the *Miranda* warning when their investigation has focused on the suspect. The defendant contends that once the investigation focused on him as a suspect, the *Miranda* warning must be given. There is Missouri case law supporting this position. Moreover, there is case law supporting the state's argument that *Miranda* is triggered only on the occurrence of a formal arrest or a restraint of the suspect's freedom of movement of a degree associated with formal arrest. We have held that the defendant was never arrested nor was he restrained of his freedom of a degree associated with formal arrest. That leaves us with the difficult question of locating where the Missouri case law draws the bright line triggering the necessity for a *Miranda* warning.

As a practical matter, we cannot ignore the suspicious character and incriminating activities of the defendant at his residence, in the ambulance and at the hospital, causing the police, at least at some point in time, to have focused their investigation on him. Notwithstanding the defendant's argument and factual assertions, there was a substantial basis for the trial court's decision that the focus of the investigation had not centered on defendant at his residence, or that it had not turned from investigatory to accusatory while the defendant was in

the ambulance. At best, and for the purpose of this decision, we accept defendant's contention that the questioning of the defendant at the hospital, translated into an accusatory focus discussed in *Zancauske* and *Lynn*. Therefore, should the "focus" test be applied in this case, thereby excluding the damaging and inconsistent statement given by the defendant at the hospital?

Missouri case law has been at loose ends because three different tests have been employed to trigger the *Miranda* warning. A "three-pronged test" commenced with *State v. Williams,* 522 S.W.2d 641, 644 (Mo.App.1975) continued in *State v. Bradley,* 670 S.W.2d 123, 126 (Mo.App.1984),[4] and results in defendant's citation of *Lynn* and *Zancauske*. Additionally, there is a line of cases our research has revealed which have held that custodial interrogation begins when police have "both reasonable grounds to believe a crime has been committed and *reasonable grounds to believe the defendant is the one who committed it.*" *State v. Pierce,* 556 S.W.2d 216, 217–218 (Mo.App.1977) (emphasis added).[5] The Court suggests that when "the two generally coincide, the warning must be given." *Id.* Finally, a third line of cases invoke the *Miranda* warning when the defendant is formally arrested or is subjected to arrest-like restraints.[6]

*Zancauske* and *Lynn* stand for the proposition that once an investigation focuses on the suspect, he is considered to be under "custodial interrogation" and must be given the *Miranda* warning. The *Zancauske*

court held that there was custodial interrogation notwithstanding the fact that defendant had been told at the outset of the interrogation that he was not under arrest and was free to leave regardless of the outcome of the interrogation, and, in fact, allowed to leave once the interview was completed. *Zancauske,* 804 S.W.2d at 859. The court held that since the police had information linking him to the crime and the questions became accusatory as the investigation focused on him, a *Miranda* warning was necessary. *Id.*

The *Lynn* court held that even though the suspect appeared at the police building voluntarily, she was specifically told she was not under arrest, was free to leave at any time, and was allowed to leave following the questioning, she could have reasonably believed she was not free to leave and therefore must have been warned of her legal rights. Citing *Zancauske* as authority, the *Lynn* court found the investigation had focused on her and held that the *Miranda* warning was required. *Lynn,* 829 S.W.2d at 554. The court acknowledged that its ruling went beyond the boundaries of *Miranda* but stated that Missouri can set up its own procedures to follow *Miranda.*[7] *Id.*

These cases cited by the defendant use what has been described as a three-pronged test to determine if "custody" exists for purposes of requiring *Miranda*. The three-pronged test includes (1) whether there was probable cause to arrest, (2) whether the investigation at the time of the interrogation had focused on the accused,

---

**4.** Other cases in this state which have used the focus or probable cause analysis to determine the triggering of *Miranda* are: *State v. Sanad,* 769 S.W.2d 436, 440 (Mo.App.1989), *State v. Swingler,* 632 S.W.2d 267, 272 (Mo.App.1982).

**5.** Applying or acknowledging this test are: *State v. Cody,* 801 S.W.2d 430, 435 (Mo.App.1990); *State v. Prewitt,* 714 S.W.2d 544 (Mo.App.1986); and *State v. Deloch,* 628 S.W.2d 954, 956 (Mo.App.1982).

**6.** Cases applying this test are: *State v. Greathouse,* 627 S.W.2d 592, 594 (Mo.1982); *State v. Huse,* 842 S.W.2d 579, 582 (Mo.App.1992); *State v. Crane,* 841 S.W.2d 271, 273 (Mo.App.1992); *State v. Kalter,* 839 S.W.2d 670, 673 (Mo.App.

1992); *State v. Mouser,* 714 S.W.2d 851, 855 (Mo.App.1986); *State v. Hayes,* 597 S.W.2d 242, 244 (Mo.App.1980) (the focus test irrelevant); *State v. Lewis,* 579 S.W.2d 744, 747 (Mo.App. 1979) (also noting that *Beckwith* made clear that *Miranda* applied to custodial interrogation after the suspect is taken into custody and rejected the "focus" test); *State v. Love,* 546 S.W.2d 441, 448–49 (Mo.App.1976) (noting that *Williams* predated *Beckwith*); *State v. Starkey,* 536 S.W.2d 858, 862 (Mo.App.1976).

**7.** *See Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714 (1977) (where the U.S. Supreme Court held that the Oregon Supreme Court read *Miranda* too broadly and reversed the Oregon Supreme Court's decision).

and (3) the subjective intent of the police officer. *Williams,* 522 S.W.2d at 644.

In order to determine when custodial interrogation commences, the *Williams* court observed that these three factors were to be considered and cited as its authority the Fifth Circuit Court of Appeals case of *Brown v. Beto,* 468 F.2d 1284 (5th Cir. 1972). However, following the *Brown* decision, the Fifth Circuit Court of Appeals in *United States v. Bengivenga,* 845 F.2d 593, 595–597 (5th Cir.), *cert. denied,* 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988), specifically repudiated the focus and probable cause test. The court conceded that its prior interpretations of *Miranda* in *Brown* had been in error and the focus of the investigation had no bearing on the question of custody for purposes of *Miranda.* While the original authority for this three-pronged test has disappeared, Missouri case law persists that "focus" is a significant factor in determining the existence of custodial interrogation.

The "focus" concept was first addressed and adopted in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) but our case law does not hold it as authority for this test. Missouri courts seem to have adopted the holding of *Escobedo* without citing or even acknowledging it. The police investigation began to focus on Escobedo when he was taken into police custody with questions designed to elicit incriminating evidence. The focus of the investigation or, as some of our cases have said, when the process shifts from investigatory to accusatory, was the bright line requiring a warning. Two years later, *Miranda* was decided and moved the timing of the warning from the focus of the investigation on the suspect to a question of whether the suspect was in custody. The *Miranda* court explained what it meant when discussing the "focus" on an accused in *Escobedo:*

By custodial interrogation, we mean questioning initiated by law enforcement officers *after* a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612 (emphasis added).

If there remained any misunderstanding of the triggering event of the *Miranda* warning, it must have been dispelled by the court's holdings in *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966);[8] *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); and *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

In Mr. Hoffa's case the focus test was not categorically rejected, but the court's analysis left little, if any, use of the test. Federal agents had sufficient information to arrest Jimmy Hoffa for jury tampering, but nevertheless, paid an informer to report his conversations to them. Mr. Hoffa argued that he had a constitutional right to be arrested since the government had focused its investigation on him and it had probable cause for his arrest. The court rejected the argument denying a constitutional right to be arrested, setting forth its pragmatic reasons for the decision.

There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence which may fall far short of the amount necessary to support a criminal conviction.

*Hoffa,* 385 U.S. at 310, 87 S.Ct. at 417.

It is one thing to require a police officer to have probable cause to arrest, but quite

---

**8.** For an excellent discussion of this problem and application of *Hoffa* and other cases, *see People v. Hill,* 429 Mich. 382, 415 N.W.2d 193 (1987), where the Michigan Supreme Court was faced with the exact problem as here. The appellate courts of Michigan had applied both the "focus" and "custody" tests with no consis-

tency. The court resolved both the federal and state law in favor of the custody test, i.e. that the warning must be given when the suspect is formally arrested or otherwise deprived of his freedom of action in any significant way. *Id.,* 415 N.W.2d at 201.

another to require an officer to determine the exact time when the focus of the investigation is on the suspect and insist that at that precise moment a *Miranda* warning must be given. Such a test would be nearly impossible in interpretation and would serve no useful purpose. The more mechanically drawn line of custody or like restraint serves the purpose of the *Miranda* decision by providing a protective device to dispel the compelling and inherent pressures of an in-custody interrogation atmosphere. *Miranda*, 384 U.S. at 468, 86 S.Ct. at 1624.

In *Beckwith*, the Supreme Court made it clear that the *Miranda* holding applied solely to those taken into custody or "otherwise deprived of his freedom in any significant way." *Beckwith*, 425 U.S. at 347, 96 S.Ct. at 1616. The defendant was the focus of the IRS's investigation, was not arrested and was not given the *Miranda* warning. The court's decision was unmistakably clear that the *Miranda* decision was confined to the narrow issue of "the admissibility of statements obtained from an individual who is subjected to custodial interrogation." *Miranda*, 384 U.S. at 439, 86 S.Ct. at 1609. The focus concept was eliminated with the court's observation:

> It was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the court to impose the *Miranda* requirements with regard to custodial questioning.

*Beckwith*, 425 U.S. at 346–47, 96 S.Ct. at 1616.

In *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984), the Supreme Court continued its determination to erase the notion that probable cause was a bright line for determining the need for *Miranda* warnings. The court noted that "[t]he threat to a citizen's Fifth Amendment right that *Miranda* was designed to neutralize has little to do with the strength of an interrogating officer's suspicions." *Id.* at 435 n. 22, 104 S.Ct. at 3148 n. 22. *See also, California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517,

3520, 77 L.Ed.2d 1275 (1983). The *Beheler* court stated that a *Miranda* warning is needed when there is a "formal arrest or restraint on freedom of movement to the degree associated with a formal arrest." *Id.* at 1125, 103 S.Ct. at 3520. The court noted that any notion that focus or custody were necessarily synonymous should have been put to rest in *Beckwith.* Indeed, the United States Supreme Court's decisions have repeatedly held that an interrogating officer's subjective intent has no bearing on the question of custody. *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151; *Minnesota v. Murphy*, 465 U.S. 420, 431, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409 (1984).

Additionally, in *Mathiason*, the court announced that the warning requirement is not triggered because the person being questioned is one whom the police suspect. The court held that the *Miranda* warning is required only where the suspect is under arrest or there has been such a restriction on a person's freedom as to render him "in custody." *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714.

We believe that two cases by our Supreme Court have set the direction.

In *State v. Feltrop*, 803 S.W.2d 1, 13 (Mo. banc) *cert. denied*, —— U.S. ——, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991), the defendant contended that the questioning before his confession was custodial interrogation and his statement should have been suppressed because he was not advised of his *Miranda* rights. The court held that even assuming the defendant was a suspect in the minds of the police, there was no custodial interrogation when a suspect is questioned where he was not under arrest or otherwise restrained of his liberty. *Id.* (citing *Mathiason*, 429 U.S. at 494–495, 97 S.Ct. at 713–14). The court applied the custody test and specifically rejected the concept of focus.

In *State v. Schnick*, 819 S.W.2d 330, 334 (Mo. banc 1991), the court dealt with a hospitalized defendant who claimed that because he was hospitalized, he was deprived of his freedom at the time he made statements to the deputy sheriff prior to the *Miranda* warning. The court held that the

coercive nature of police activity was a necessary predicate to finding any statement inadmissible and since defendant was not under arrest or restrained by the deputy sheriff or any other officer, no warning was required. *Id.* at 334.

■ We decline to follow the decisions that apply a test that suggest the focus of the investigation is a factor to be considered to determine when the *Miranda* warning is required. In this case, whether the investigation had focused on the defendant or whether there existed probable cause to arrest are not relevant for the purpose of our decision. The *Miranda* warning is not triggered by suspicions of the police or the focus of their investigation. "Custodial interrogation" occurs only when the suspect is formally arrested or is subjected to arrest-like restraints. *Schnick,* 819 S.W.2d at 330; *Feltrop,* 803 S.W.2d at 13. This court is constitutionally bound to follow the last controlling opinion of our Supreme Court. *Mo. Const.* art. V, § 2 (1945). The defendant was not in police custody and he was not subjected to arrest-like restraints. The trial court did not err in permitting testimony relating to the defendant's hospital statements about the shooting.

■ The defendant next complains that three separate pieces of evidence unsupported by appropriate scientific foundation were received by the court. No objection was made to any of the testimony and defendant requests plain error review in accordance with Rule 30.20. This rule provides that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Rule 30.20.

■ First, he faults the medical examiner's conclusion that the death was the result of a homicide. Trial counsel, Mr. Robert Duncan, stipulated to the medical examiner's testimony, which included the examiner's conclusion that the victim's death was a "probable homicide." The parties expressly agreed that excerpts from the medical examiner's pretrial suppression hearing were to be introduced into evidence. The defendant cannot now complain that the testimony was improperly admitted when trial counsel stipulated to the evidence. A client is bound by the decisions of his counsel as to the stipulations which give effect to trial strategy. *State v. Johnson,* 829 S.W.2d 630, 633 (Mo. App.1992).

■ The defendant condemns the Regional Crime Lab chemist's testimony that describes the red stains located on the wall immediately above the victim's body as "blood stains." The red stains were a few inches from where the bullet struck the wall and no one made any tests to establish that the stains were, in fact, human blood.

Considering the location of the red stains, the dead body and the point where the bullet struck the wall, a reasonable conclusion results that the red stains were blood splatterings of Mrs. Middleton. This was an acceptable conclusion and the trial court did not err in failing to *sua sponte* strike the evidence. The third point is denied.

■ The defendant's final charge of plain error is directed to the firearm and tool-mark examiner who testified on cross-examination and redirect that the force of a bullet shot to the head of a person would not cause the victim's head to jerk in a backward motion. The defendant contends this was not the proper subject of expert testimony, particularly from this witness. The difficulty with this argument is that the defendant's counsel first elicited this testimony from the witness on cross-examination. A defendant cannot complain about testimony that was first elicited by his attorney on cross-examination. *State v. Hicks,* 716 S.W.2d 387, 389 (Mo.App.1986). The defendant's fourth point is denied.

■ For his fifth point on appeal, the defendant complains for the first time that Instruction No. 4, MAI–CR3d 302.04 defining reasonable doubt, impermissibly reduced the state's burden of proof. The defendant made no specific objection at the instruction conference nor did he raise the matter in his motion for new trial. He has raised the point on appeal for the first time

treating it as though a proper objection had been made. He has not requested that the matter be reviewed under plain error pursuant to Rule 30.20. We decline to gratuitously review the charged error, particularly in light of the repeated rulings by our Supreme Court on the subject. *See State v. Ervin,* 835 S.W.2d 905, 924 (Mo. banc 1992); *State v. Blankenship,* 830 S.W.2d 1, 13 (Mo. banc 1992). The point has been waived.

■ The defendant maintains that the court committed plain error in submitting the murder verdict-directing instruction because the final paragraph of the instruction injects an improper element. The final paragraph reads:

> If you do find the defendant guilty under Count 1 of murder in the first degree, you will assess and declare the punishment at imprisonment for life without eligibility for probation or parole.

It was the jury's responsibility to assess the penalty in this case because the state waived the death penalty and defendant was not charged as a prior, persistent, or dangerous offender under § 558.016, RSMo.1986. This was the applicable instruction under the law and the Notes on Use [9] and it must be given to the exclusion of any other instruction. *State v. Rogers,* 825 S.W.2d 49, 54 (Mo.App.1992).

■ For an instructional error to rise to the level of plain error, the trial court must have so misdirected or failed to instruct the jury as to cause manifest injustice or a miscarriage of justice, and the defendant has the burden of establishing that the error resulted in "manifest injustice." *State v. Cline,* 808 S.W.2d 822, 824 (Mo. banc 1991). Here, there is no error, plain or otherwise. Point denied.

■ Finally, under the defendant's Rule 29.15 appeal, he claims that his trial counsel was ineffective because he did not adequately investigate the defendant's medical condition and treatment at the time of, and immediately after, the shooting.

Specifically, the defendant claims Mr. Duncan failed to obtain the medical records from St. Mary's Hospital in Blue Springs, Missouri, which would have shown that the defendant received medical treatment. Defendant maintains this evidence would tend to counter the state's position that he was feigning unconsciousness, that the police officer arrived at the hospital with him, and that the police were to be notified before his release, which was critical to his assertion that he was a suspect at the time and in a custodial situation. Trial counsel requested the records but they did not arrive before trial and no more attempts were made. During the Rule 29.15 hearing, Mr. Duncan testified that had the medical records been available to him in the course of the trial, he would have called on experts to testify on defendant's behalf.

■ Our review of a denial of the post-conviction motion is limited to a determination of whether the findings of fact and conclusions of law issued by the hearing court are "clearly erroneous." *State v. Twenter,* 818 S.W.2d 628, 635 (Mo. banc 1991). Deference will be given to the motion court's superior opportunity to judge the credibility of the witnesses. *Id.* The defendant must prove by a preponderance of the evidence that his attorney's performance was deficient and this deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984).

The first part of the test requires a showing that the attorney's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* The defendant must prove specifically what the attorney failed to disclose. Where the record fails to reflect that the evidence the attorney neglected to present would have provided him with a viable defense, his claim of ineffectiveness will be denied. *Twenter,* 818 S.W.2d at 637, 640. The defendant claims that the records would prove that he was not faking his

---

**9.** Note on Use 3 to MAI–CR3d 313.02 and Supplemental Note on Use 5(A)(2) to MAI–CR3d 313.00

condition because they would show he received treatment.

However, those medical records only revealed that tests were performed. They do not indicate any medical treatment. Because the medical records do not support the defendant's claim, failure to obtain them prior to trial had no effect on the outcome.

Further, because the records showed that the police officer arrived with him and that the police were to be notified before he was released is irrelevant to any issue in this case as we have previously discussed at length. Whether the investigation had focused on the defendant was not a relevant consideration. The hearing court's findings are not "clearly erroneous."

The judgment of convictions for murder in the first degree and armed criminal action and the motion court's denial of the defendant's Rule 29.15 motion are affirmed.

All concur.