STATE of Missouri, Respondent,

v.

Reis P. KELLEY, Appellant.

No. WD 46350.

Missouri Court of Appeals,
Western District.

April 25, 1995.

As Modified June 27, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 27, 1995.

Application to Transfer Denied
July 25, 1995.

Craig A. Johnston, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ULRICH, P.J., and KENNEDY and BERREY, JJ.

ULRICH, Presiding Judge.

Reis P. Kelley appeals his convictions, following jury trial, of six counts of arson in the second degree, § 569.050, RSMo 1994, three counts of arson in the first degree, § 569.040, RSMo 1994, and three counts of tampering in the first degree, § 569.080.1(2), RSMo 1994. Mr. Kelley was sentenced as a prior offender under section 558.016.2, RSMo 1994, to an aggregate 81 years imprisonment.

Mr. Kelley also appeals denial, following a hearing, of his Rule 29.15 postconviction motion. On December 21, 1992, Mr. Kelley filed a *pro se* motion under Rule 29.15 seeking to set aside his convictions and sentences. An amended motion was then filed by appointed post-conviction counsel. Among the grounds asserted in his amended motion was that his trial attorney had been ineffective in failing to request instructions on the lesser-included offense of arson in the second degree on three counts. After the hearing, the motion court entered an order, along with findings of fact and conclusions of law, denying Mr. Kelley's motion. The appeals are consolidated pursuant to Rule 29.15(*l*).

The judgment of conviction on each of the twelve counts is affirmed.

The motion court's order denying postconviction relief is affirmed.

In the falls of 1989 and 1990, North Kansas City was plagued with a series of 12 arson fires. The first occurred on September 28, 1989. Janna Courtney, who lived in a duplex across the street from Mr. Kelley, awoke at approximately 5:40 a.m. to the sound of her car alarm and her barking dog. She looked out the window to find her car, which was parked in a detached garage she shared with the other occupants of the duplex, in flames. When the fire department arrived, the garage was also on fire. The fire destroyed the car and its contents. The North Kansas City fire marshal determined that the fire had been intentionally set.

Five days later, on October 3, 1989, Ms. Courtney's neighbor, Marion Craig, was awakened at 5:00 a.m. by "popping sounds" coming from her garage. When she looked outside, she saw a fire in the garage. The fire destroyed her 1983 Toyota which was parked in the garage. The fire marshal determined that the fire had been intentionally set inside the garage at the back wall and had spread to the vehicle. A police officer later observed Mr. Kelley at the scene of the fire. The officer was in his patrol car, across the street from Ms. Craig's duplex, writing a report when Mr. Kelley strolled by and looked at the officer.

Later that morning, Bonnie Dukart, who was living in a rented two bedroom house with an attached garage, awoke between 5:30 a.m. and 6:00 a.m. to her smoke alarm. The house was filled with smoke, and she experienced difficulty breathing. The fire had started in the garage and spread to the attic of the house. The fire department arrived quickly and put out the fire. The fire marshal determined that the fire had been intentionally set in a couch or a storage unit in the back of the garage. Several years before, Mr. Kelley had lived in this house with his mother.

On the same morning half a mile away, Bonnie Webel was dressing between 5:30 a.m. and 6:00 a.m. when she heard "popping" noises outside her home. At 6:00 she went to her kitchen door where a fire fighter instructed her to stay inside. Firemen were extinguishing the fire burning her 1979 Chevette in her driveway. The fire marshal again determined the fire was intentionally set and had started on the floorboard of the passenger's side.

Larry Richards was the fourth arson victim that morning. At approximately 6:30

a.m., a man knocked on Mr. Richards' door and informed his wife that their car was on fire. Mr. Richards went outside and used a fire extinguisher to put out what was left of the fire. The car was damaged with the remains of the dash on the floorboard and the driver's seat destroyed. Mr. Richards had taught school as a substitute teacher, and he was acquainted with Mr. Kelley who had been a student in a class he had taught.

Four days later, on October 7, 1989, Pauline Leonard, who lived in an apartment building, was awakened at about 2:45 a.m. by her smoke alarm. She could see a fire through the glass panels of her front door. When she opened the door, she discovered that a large silk and straw flower arrangement hanging on the front door was in flames. Part of the burning arrangement fell on the rug outside the door and the carpeting inside the house when she opened the door. Ms. Leonard was able to douse the fire with water before the fire department arrived. The fire marshal again determined that the fire had been intentionally started by someone. Five minutes before the fire, a police officer saw Mr. Kelley standing on the corner in front of Ms. Leonard's building.

On the evening of November 16, 1989, Mr. Kelley was at the apartment of a friend, Edward Kowinski, in North Kansas City drinking beer. Mr. Kelley was upset, stating that the police were hassling him about the fires in North Kansas City. He then left about 9:30 p.m., alone. Mr. Kowinski said that in October, Mr. Kelley admitted to him that he set one of the fires the police were investigating.

Delita Johnston lived in a duplex with a detached garage. Sometime around 3:30 a.m. on the morning of November 17, 1989, Ms. Johnston was awakened by fire trucks. She discovered that her garage, which she shared with neighbors, was on fire. Before the fire could be extinguished, it damaged the roof of the garage and some general household goods stored there. The fire marshal found a "possible pour pattern caused by a flammable or combustible liquid poured on the floor in the garage." The evidence es-

tablished that the fire had been intentionally set.

A police officer who was on routine patrol observed Mr. Kelley at about 3:00 a.m. that morning three blocks from the scene of the fire. After the fire was reported, another officer spotted Mr. Kelley approximately a mile away walking up North Oak Street, out of breath. He told the officer that he had been visiting his friend, Ed Kowinski, until 3:00 a.m.

Mr. Kelley was interviewed by Scott Meyer of the North Kansas City Police Department on November 17, 1989. Initially, Kelley denied setting the fire that morning. He was approximately half of a mile away from the fire when he was arrested. A short time later, Officer Meyer asked Mr. Kelley if his conscience was bothering him, and Mr. Kelley answered "yes." He said he was afraid of going back to jail. When asked about the fires again, Mr. Kelley said he was "going to have to stick with his original story, and deny any knowledge of any of the fires." Approximately fifteen minutes later, Mr. Kelley said he would admit to starting three of the fires if he could avoid going to jail that weekend. When asked for specific dates and locations of the fires, Mr. Kelley responded saying to pick any of them in October or the one near French Quarters, a location in North Kansas City, where a car was burned on October 27. Officer Meyer reviewed police files and found a fire at that location but on a different date. Officer Meyer concluded his interview with Mr. Kelley.

In the summer of 1990, Mr. Kelley began working with a friend named Beverly Thrall. On two occasions Mr. Kelley talked with Ms. Thrall about the fires that had occurred in North Kansas City. Whenever she gave him a ride in her vehicle, they were followed by a North Kansas City police officer. When she asked Mr. Kelley if he was responsible for the fires, he answered, "yes, but not the one across the street." A second conversation occurred later that year where Mr. Kelley again admitted to Ms. Thrall to setting the series of fires except one.

Another series of fires occurred in North Kansas City in the fall of 1990. On August 9, 1990, Bonnie Yeager was awakened at 2:00

a.m. by a loud banging noise and a fire. Ms. Yeager lived in a two story house with a detached garage. Two cars were parked in the garage, and two were outside. One of the vehicles outside was on fire. By the time the fire was extinguished, it had spread to the garage and had damaged the vehicles within the garage, too. The fire marshal stated that a fire had been intentionally set in one of the cars outside. At the scene, police noticed that the parking lights of a van belonging to Betty Mendenhall, Ms. Yeager's neighbor, were on and the passenger door was open. One of the officers found a book of King Louie Family Recreation Center matches in the van. Ms. Mendenhall was not a smoker, and knew that the matches had not been in the van when she parked it that evening.

Mr. Kelley dated Kelly Packham in October of 1990. At 10:00 on the night of October 23, 1990, she picked up Mr. Kelley at King Louie where he was then working. As they left the bowling alley, they began to argue over Mr. Kelley's demand to drive her car. The argument escalated once she started to drive away. Finally after more yelling by Mr. Kelley, Ms. Packham turned into a grocery store parking lot and went inside the store alone. She remained in the store for about ten minutes until a man came in yelling that a car was on fire. She rushed to the door and saw flames emanating from within her car. The fire burned the front seat causing a big hole in it. A fire investigator concluded that the fire had been intentionally set.

Later that evening, Maurice Scott, who lived in a ground-floor apartment, awoke at 11:50 p.m. to the sound of someone opening the doors of his metal storage shed. When he got to the kitchen, he saw flames immediately outside his kitchen door. The flames reached the eaves of the apartment building and spread to the attic. Police later found rags at the base of the metal shed. From examination of photographs taken of the scene, the fire marshal concluded that the fire was not accidental.

Lillian Baker, Ms. Packham's mother, spoke with Mr. Kelley shortly after her daughter's car was burned. She asked him if he was responsible for the fire, and he denied it. She also asked him if he was responsible for the other fires in North Kansas City. Mr. Kelley answered, "yes, six," walked to Ms. Baker, put his head on her shoulder, and began crying.

On November 2, 1990, Naomi Kemper was asleep in her home when she was awakened by someone ringing the doorbell and pounding on her door. A young man she did not recognize was at the door, and he informed her that her shed was on fire. She later identified Mr. Kelley as the young man. She went to the back door. The knob was hot to the touch. She then ran out the front door and saw that her detached garage, which was several feet from her house, was on fire. The heat from the fire broke several windows in the back bedroom and blistered paint on the trim. Ms. Kemper's garage and some antique furniture inside were damaged. The fire marshal determined that the fire had been intentionally set on a table inside the garage. He also testified at trial that if the fire had not been extinguished, it would have consumed the house. A police officer saw Mr. Kelley standing outside his house across the street from the scene of the blaze. When asked where he had been all night, Mr. Kelley told him that he was with two friends. He did not tell the officer that he had knocked on Ms. Kemper's door.

On November 3, 1990, the North Kansas City police began around-the-clock surveillance of Mr. Kelley. They watched his house, and if he went anywhere on foot, they followed him. When he was followed, he attempted to evade the officers by using back alleys, walking between houses, and doubling back on his route. Several times Mr. Kelley succeeded in losing the officer following him afoot.

On the evening of November 8, 1990, Jerold Graybill, who had met Mr. Kelley when they were inmates at the Clay County jail, asked Mr. Kelley if he was setting the fires. Mr. Kelley said that he was and that the count was at ten. Two weeks later, Mr. Kelley described to Mr. Graybill how he had set a car in a garage on fire and then sat down the street to watch it burn. He also told Mr. Graybill that he started a fire in an

apartment building and explained that he had stuffed rags by a door to ignite the blaze and had thrown a hammer through a window. Mr. Kelley explained to Mr. Graybill that he was setting the fires as revenge for his having previously been arrested and put in jail.

The last fire occurred on December 19, 1990. Sandra Brown lived in a duplex with a detached garage. That night, as she was returning home at about 11:30 p.m., she saw a fire truck in her driveway. Her garage was on fire. Her son, who was home at the time, was able to get his car out of the garage before the fire consumed it, but the neighbor, Crystal Stevens, was not so fortunate. The fire chief testified that the fire started when someone poured some type of volatile liquid on the garage floor and set it on fire. He said that resin stored in the garage could have been used.

Officer Danny Ruth had Mr. Kelley under surveillance that night. Officer Ruth lost sight of Mr. Kelley on two occasions. The last location where Officer Ruth saw Mr. Kelley was across the street from the fire. Fifteen to twenty minutes had elapsed from the time Officer Ruth last saw Mr. Kelley until the fire was reported.

Later that night, police executed a search warrant at Mr. Kelley's home and arrested him. They also seized some of his clothing and a cardboard box of King Louie matches. The clothes were used to provide Mr. Kelley's scent to a bloodhound tracking dog. The dog was taken to the Brown's duplex and introduced to the scent. The dog followed Mr. Kelley's scent approximately six blocks to Mr. Kelley's apartment.

I

■ Appellant claims in his first point on appeal that the evidence was insufficient to establish that the fires were caused by appellant. He claims the trial court erred in denying his motion for acquittal at the close of all the evidence and in accepting the jury's guilty verdict on eleven of twelve counts. Additionally, Mr. Kelley argues that the evidence was not sufficient to support a conviction in six of the counts because the state failed to prove certain elements of the crimes charged.

■ Appellate courts consider all substantial evidence in a light most favorable to the state and grant the state all reasonable inferences from the evidence when reviewing a challenge to the sufficiency of evidence. *State v. Grim,* 854 S.W.2d 403, 411 (Mo. banc 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993); *State v. Middleton,* 854 S.W.2d 504, 506 (Mo.App.1993). All contrary evidence and inferences are disregarded. *Id.* Furthermore, the reviewing court neither weighs the evidence nor determines the reliability or credibility of witnesses. *Middleton,* 854 S.W.2d at 506. Instead, the court's review is limited to a determination of whether the evidence is sufficient to build a submissible case and whether there is sufficient evidence from which a reasonable jury could find defendant guilty. *State v. Smith,* 849 S.W.2d 677, 679 (Mo.App. 1993).

■ Mr. Kelley first complains that the evidence was insufficient to establish that eleven of the twelve fires were started by him. The state bears the burden of proving the criminal agency of the defendant beyond a reasonable doubt. *Middleton,* 854 S.W.2d at 508. The guilty agency of the accused may be established with direct or circumstantial evidence. *State v. Hendrickson,* 814 S.W.2d 609, 613 (Mo.App.1991) (citing *State v. Walters,* 735 S.W.2d 737, 740 (Mo.App. 1987)). The evidence, regardless whether direct or circumstantial, is sufficient to support a conviction if it convinces a reasonable juror beyond a reasonable doubt of the defendant's guilt. *State v. Bragg,* 867 S.W.2d 284, 289–90 (Mo.App.1993). The defendant's opportunity to commit the offense, alone, is insufficient to support a conviction for arson. *Hendrickson,* 814 S.W.2d at 613. However, evidence placing a defendant at the scene of a fire and lack of evidence placing anyone else on the premises may be sufficient to support a conviction. *State v. Sobel,* 672 S.W.2d 377 (Mo.App.1984). *See also State v. Townsend,* 810 S.W.2d 726 (Mo.App.1991). Additionally, attempts to deceive the police, *Townsend,* 810 S.W.2d at 727, and evidence of a bloodhound trailing the defendant, *State*

*v. Fields*, 434 S.W.2d 507 (Mo.1968), are circumstances which may infer guilt.

The state in the instant case presented evidence that all of the fires were intentionally set in automobiles, garages, or sheds and occurred very late at night or during early morning hours. Mr. Kelley was seen in the vicinity of several of the fires or lived near the victims. Evidence was also presented that when Mr. Kelley was ultimately placed under surveillance, he attempted to evade officers by using alleys, walking between houses, and doubling back on his own route. On the night of the last fire, the officer following Mr. Kelley lost sight of him near the scene of the fire, and the fire was reported a short time later. Later that evening, a bloodhound under direction of the police department followed Mr. Kelley's scent from the scene of the fire to his apartment.

The state did not depend on circumstantial evidence alone. It's case was replete with admissions by Mr. Kelley regarding his involvement in the crimes. Evidence of admissions to Edward Kowinski, Beverly Thrall, Jerold Graybill, and Lillian Baker were introduced by the state. Also, Officer Meyer testified that Mr. Kelley admitted to him to setting "any" of the fires in October of 1989 "or" the fire in the French Quarters during November of 1989. The evidence was sufficient to allow a reasonable jury to find Mr. Kelley set the North Kansas City fires.

▇▇▇ Next, Mr. Kelley argues that certain elements of first degree arson, § 569.040, RSMo 1994, second degree arson, § 569.050, RSMo 1994, and first degree tampering, § 569.080, RSMo 1994, were not sufficiently established by the evidence to sustain the convictions in six counts. In considering whether the evidence is sufficient to support the jury's verdict, the appellate court must examine the evidence supporting each element of the crime charged. *Grim*, 854 S.W.2d at 411. To sustain a conviction for first degree arson, § 569.040, RSMo 1994, the state must have proven (1) that the defendant knowingly damaged a building or inhabitable structure, (2) by starting a fire or causing an explosion, (3) with persons then present or in near proximity and (4) thereby recklessly placing such person in danger of

death or serious injury. § 569.040, RSMo 1994.

▇▇▇ Specifically, Mr. Kelley challenges the sufficiency of the evidence regarding whether the victims in two counts were placed in danger of death or serious injury. Expert testimony that a fire would have spread to the interior of a house and that it would have produced deadly gas is sufficient evidence that the inhabitants were in danger of death or serious injury. *State v. Letcher*, 772 S.W.2d 795, 798 (Mo.App.1989).

In this case, an expert, Dr. James Coleberd, testified that the victims of both counts, Mr. Scott and Ms. Kemper, were placed in danger of death or serious injury by the fires at their residences. Evidence was introduced that a fire was started in Mr. Scott's shed and quickly ignited the eaves of his apartment building spreading into his attic. Likewise, there was evidence that a fire started in Ms. Kemper's detached garage and broke several upstairs windows and blistered paint on the trim in her house. Additionally, the fire marshal testified that the fire could have progressed to her house producing toxic fumes had the fire not been extinguished. The state, therefore, presented sufficient evidence to support each element of arson in the first degree.

▇▇▇ Next, Mr. Kelley challenges the sufficiency of the evidence regarding three counts of second degree arson. The elements of second degree arson, § 569.050, RSMo 1994, are (1) that the defendant knowingly damaged a building or inhabitable structure, (2) by starting a fire or causing an explosion, and (3) the fire was of an incendiary origin. § 569.050, RSMo 1994. Mr. Kelley argues that in two counts, the state failed to present sufficient evidence that he knowingly damaged a building. In one count, evidence was presented that a car parked next to a garage used by Ms. Yeager was set on fire. In the second count, the evidence demonstrated that Ms. Courtney's car was parked inside her garage when the fire was set. Involvement of the garages in the fires was the natural and probable consequence of initiating the fires to the vehicles. The evidence was sufficient to allow a reasonable

jury to conclude that Mr. Kelley knowingly damaged the garages and thus was guilty of second degree arson.

In the third count, Mr. Kelley argues that insufficient evidence was presented that a building was damaged where a wreath was set on fire outside Ms. Leonard's door. When the door was opened, the ignited wreath fell inside the door, igniting the carpeting. This evidence was sufficient to support the finding that a building was knowingly damaged, a requisite element of second degree arson.

■■■ Mr. Kelley's final contention regarding the sufficiency of the evidence is directed to a first degree tampering count. The elements of this offense are (1) that the defendant knowingly receives, possesses, sells, alters, defaces, destroys or unlawfully operates (2) an automobile (3) without the consent of the owner. § 569.080(2), RSMo 1994. Mr. Kelley argues that the evidence was insufficient to prove that Mr. Richard's Ford Taurus was destroyed. Mr. Richards testified, and accompanying exhibits showed that the remains of the dash were laying on the floorboard and that the driver's seat was extensively damaged as a result of the fire set in the vehicle. The evidence, therefore, was sufficient to support a conviction for first degree tampering for destroying an automobile.

Point one is denied.

## II

■■■ In his second point, appellant claims the trial court erred in refusing to sever the charges against him. Mr. Kelley argues that he was substantially prejudiced by trying the cases together because the state was allowed to introduce evidence of numerous separate crimes that would not have been admissible had the offenses been tried separately. Furthermore, he contends that the evidence was complex, and the jury was unable to distinguish the evidence as to each offense and judge each count on its own merits.

■■■ A defendant in a criminal action does not have a state or federal constitutional right to be tried on only one offense at a time. *State v. Olds,* 831 S.W.2d 713, 718 (Mo.App.1992). Liberal joinder of criminal charges is favored for the sake of judicial economy. *Id.*

■■■ Appellate review of a claim of severance involves a two-step analysis. *State v. Tobias,* 873 S.W.2d 650, 653 (Mo.App. 1994); *State v. Davis,* 860 S.W.2d 369, 372 (Mo.App.1993). First, the appellate court must consider whether the joinder of the counts in the indictment was proper. *Id.* If the joinder is found to have been proper, the court must determine if the trial court abused its discretion in refusing to sever the offenses. *Id.* Joinder of offenses is either proper or improper under the law, while severance is discretionary with the trial court. *State v. Stoer,* 862 S.W.2d 348, 352 (Mo.App.1993).

■■■ Section 545.140(2), RSMo 1994 and Rule 23.05 govern joinder of offenses. Offenses may be joined in one indictment if they are of the "same or similar character" or based on two or more acts that are "part of the same transaction". Rule 23.05. In this case, all twelve charges were arson-related offenses involving the burning of automobiles or garages. They all occurred at night or in the early morning hours during a fifteen month period, several on the same date, all within the same geographical location. The manner in which the crimes were committed was so similar that the commission by the same person was likely. *Id.* at 718–19. The offenses, therefore, were of the same or similar character, and joinder was proper.

■■■ The next issue considered is whether the trial court's refusal to sever was appropriate. "A denial of severance will not be reversed absent an abuse of discretion and a clear showing of prejudice." *Tobias,* 873 S.W.2d at 653 (citing *State v. Olds,* 831 S.W.2d 713, 719 (Mo.App.1992)). In determining whether to grant a motion to sever, the trial court must weigh the benefits of trying the offenses simultaneously against the potential prejudice to a defendant. *Davis,* 860 S.W.2d at 373. Relevant factors to be considered by the trial court in the determination of prejudice include the number of offenses charged, the complexity of

the evidence offered, and whether the jury will be able to distinguish the evidence and apply the law intelligently to each offense. *State v. Conley,* 873 S.W.2d 233, 238 (Mo. banc 1994) (quoting *State v. McCrary,* 621 S.W.2d 266, 272 (Mo. banc 1981)). Another relevant factor in assessing prejudice is whether evidence of separate crimes would have been inadmissible propensity evidence had the two crimes not been joined. *Conley,* 873 S.W.2d at 238. However, severance is not mandated merely because evidence relating to one count would not be admissible in the trial of a second count if the two were tried separately provided the evidence with regard to each crime is sufficiently simple and distinct to mitigate the risks of joinder. *Id.* (citing *United States v. Halper,* 590 F.2d 422, 431 (2nd Cir.1978)).

While it is true in this case that numerous offenses were charged and witnesses testified, the testimony was uncomplicated. Each offense concerned a different victim at a different location with different witnesses. The evidence regarding each fire was distinct and clear. Nothing in the record indicates that the jury could not differentiate between the evidence and resolve each count on its own merits. The trial court did not abuse its discretion in refusing to sever the charges.

Point two is denied.

## III

█ In point three, appellant contends that the trial court erred in allowing Dr. James Coleberd to testify as an expert because he was not disclosed as a witness until three days into trial. Dr. Coleberd, a physician and former fire fighter, was asked a series of hypothetical questions and testified that Ms. Kemper, Ms. Dukart and Mr. Scott were in danger of death or serious injury from flames or toxic fumes as a result of the fires that occurred at their residences. Mr. Kelley claims that the state violated Rule 25.03 in failing to provide timely discovery and that permitting Dr. Coleberd to testify was fundamentally unfair.

Rule 25.03 requires the state, upon written request, to disclose to the defendant the names and addresses of any person it intends to call as a witness. Rule 25.03(A)(1). "The basic objective of the discovery process in criminal proceedings is to permit the defendant a decent opportunity to prepare in advance of trial and avoid surprise." *State v. Kehner,* 776 S.W.2d 396, 397 (Mo.App.1989). The state did not comply with Rule 25.03. Mr. Kelley requested the names of individuals that the state intended to call as witnesses a year prior to trial. Dr. Coleberd was not disclosed or endorsed until three days into trial.

█ The trial court may impose sanctions for a party's failure to comply with a discovery request. Rule 25.16. Whether a sanction should be imposed for violation of Rule 25.03 is a matter within the sound discretion of the trial court. *State v. Neil,* 869 S.W.2d 734, 738 (Mo. banc 1994). The denial of a requested sanction is an abuse of discretion only where the admission of evidence results in fundamental unfairness to the defendant or substantively alters the outcome of the case. *State v. Toler,* 889 S.W.2d 158, 161 (Mo.App.S.D.1994); *Neil,* 869 S.W.2d at 738. The Missouri Supreme Court discussed the late endorsement of an expert in *State v. Richter,* 647 S.W.2d 513 (Mo. banc 1983). The Court held that where a recess was granted to allow the witness to be interviewed before his testimony and the testimony was fairly brief, the defendant was not prejudiced and the testimony did not result in any fundamental unfairness. *Id.* at 520–21.

Likewise, in the instant case, Mr. Kelley's counsel was granted a recess to interview Dr. Coleberd before his testimony. Furthermore, the trial court gave counsel three days to bring in an additional rebuttal witness or to recall Dr. Coleberd. Dr. Coleberd's testimony was brief and addressed only one element of the case, that persons present in a burning dwelling were at risk of death or serious injury. While this element was the difference between first-degree and second-degree arson, it alone did not substantively alter the outcome of the case. The jury could have reasonably found, without the doctor's testimony, that the victims of the three counts were placed in danger of death or serious injury. The trial court did not

abuse its discretion in allowing Dr. Coleberd to testify after his late endorsement.

Point three is denied.

## IV

In points four and five, appellant claims the trial court erred in denying his Rule 29.15 motion for post-conviction relief. Mr. Kelley alleges that he received ineffective assistance of counsel when his trial counsel failed to request instructions on the lesser-included offenses of arson in the second degree under Counts II, III and X. Alternatively, he asserts that his post-conviction counsel abandoned him by failing to file a timely amended motion and, therefore, the case should be remanded to the motion court for a determination of the reason for the untimely filing.

Appellate review of a denial of postconviction relief is limited to whether the motion court's findings and conclusions are clearly erroneous. Rule 29.15(j). "The findings and conclusions are clearly erroneous only if a review of the entire record leaves the reviewing court with a definite and firm impression that a mistake was made." *State v. Nolan*, 872 S.W.2d 99, 104 (Mo. banc 1994).

Mr. Kelley filed a *pro se* motion for post-conviction relief pursuant to Rule 29.15 on December 21, 1992. Counsel was appointed and a filing date for an amended petition was eventually set for May 7, 1993. An amended petition was filed on May 10, 1993, out of time. At the evidentiary hearing, the motion court indicated that the delay was the fault of counsel and ruled on the merits of the *pro se* and amended motions.

Mr. Kelley suggests that if this court does not rule on the merits of his appeal because of the untimely filing of the amended postconviction motion, the motion should be remanded to the motion court for a hearing on abandonment. Failure of postconviction counsel to comply with the time requirements of Rule 29.15(f) constitutes a form of abandonment. *State v. Ervin*, 835 S.W.2d 905, 928 (Mo. banc 1992) (citing *Sanders v. State*, 807 S.W.2d 493 (Mo. banc 1991)), *cert. denied*, — U.S. —, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). Normally,

where an amended motion has been filed out of time, the appropriate remedy is to remand the case to the motion court to determine the cause of the untimeliness. *Ervin*, 835 S.W.2d at 928. However, where the movant was not responsible for the delay in filing the amended motion and the motion court rules on the claims of the amended motion, "[r]emand to the motion court would serve no purpose beyond delay." *Id.*

The record in this case does not indicate that Mr. Kelley caused the delay in filing the amended motion. The motion court found the failure to timely file the amended motion to have been counsel's, heard evidence regarding the claims in the amended motion, and ruled on the merits of the amended motion. Remand to the motion court, therefore, is not necessary and the merits of Mr. Kelley's appeal of the motion court's denial of postconviction relief are reviewable.

To prevail on an ineffective assistance of counsel claim, a convicted defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Nolan*, 872 S.W.2d at 104 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984)). Counsel is deficient if he or she fails to exercise the customary skill and diligence that a reasonably competent attorney would exercise under similar circumstances. *Id.* The movant must overcome a presumption that counsel is competent. *State v. Harris*, 870 S.W.2d 798, 814 (Mo. banc 1994) (citing *State v. Debler*, 856 S.W.2d 641, 652 (Mo. banc 1993)), *cert. denied*, — U.S. —, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). Prejudice is shown where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Nolan*, 872 S.W.2d at 104 (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068).

Sound trial strategy is not a ground for ineffective assistance of counsel. *Harris*, 870 S.W.2d at 814 (citing *Ervin*, 835 S.W.2d at 931). Likewise, "[a]n objectively reasonable choice not to submit an available instruction does not constitute ineffective assis-

tance of counsel." *Love v. State,* 670 S.W.2d 499, 502 (Mo. banc 1984) (citing *McClain v. State,* 560 S.W.2d 894, 896 (Mo.App.1978)). Instead, the test to be applied is "whether a reasonably competent attorney would have performed differently under similar circumstances." *Love,* 670 S.W.2d at 502.

In *Love v. State,* a defendant was convicted of second degree murder and moved under Rule 27.26 to have his conviction set aside alleging that his defense counsel rendered ineffective assistance in failing to request a manslaughter instruction, a lesser-included offense. *Id.* at 500–501. The court found that counsel had made a conscious decision not to request the instruction because he did not want to confuse the jury with an instruction inconsistent with the defense theory— that the defendant was totally innocent of the killings. *Id.* at 501. The court further decided that "[p]laced in the same situation, a reasonably competent attorney could have concluded that it was in the best interest of his client to deny the jury the opportunity to compromise on some middle ground between second degree murder and acquittal." *Id.* at 502.

Similarly, in this case, Mr. Kelley's counsel testified at the Rule 29.15 hearing that she elected not to request instructions on the lesser-included offense of second-degree arson in three of the counts. She felt that she could not persuasively argue that Ms. Kemper, Ms. Dukart, and Mr. Scott had not been placed in danger of serious physical injury. Moreover, the defense theory was that Mr. Kelley had not been involved in any of the fires, and the submission of lesser-included offenses would not have helped the theory. It was reasonable for Mr. Kelley's counsel to decide not to request these instructions as part of a trial strategy. The motion court did not err in denying Mr. Kelley post-conviction relief under Rule 29.15.

Points IV and V are denied.

V

■ In his final point, appellant argues that the trial court erred in admitting fire incident reports under the Uniform Business Records as Evidence exception to the hearsay rule. §§ 490.660 *et seq.* Mr. Kelley argues that the state did not properly qualify the admitted reports as business records.

■ The Uniform Business Records as Evidence Law applies to criminal cases as well as civil. *State v. Graham,* 641 S.W.2d 102, 106 (Mo. banc 1982). Investigative reports may be admitted as business records when properly qualified under section 490.680, RSMo 1994. *See State v. Cuno,* 869 S.W.2d 285 (Mo.App.1994); *State v. Harry,* 741 S.W.2d 743 (Mo.App.1987). Section 490.680 allows the admission of relevant evidence if "the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event." § 490.680, RSMo 1994. It must be shown that the report was "based either upon the entrant's observations or on the information of others with a duty to transmit it to the entrant." *Harry,* 741 S.W.2d at 744. The trial court has broad discretion in determining whether a sufficient foundation was established for the admission of a business record. *Id.*

In this case, the North Kansas City Police captain, Edward Enderson, testified as a person with access to the fire incident reports, that they were prepared and kept in the usual and customary course of the fire and police departments' business and that they were recorded at the time of the fires. The nature of the reports themselves satisfied the requirement regarding the mode of the reports' preparation. The reports were on printed forms identified as reports from the office of the state fire marshal. They contain a description of the fire incidents, related injuries, and extent of damage. Additionally, the reports were prepared at or near the time of the fires by firemen who observed the fires and damage. A finding that these reports were regularly used by the fire department to record details of fires was within the trial court's discretion. The reports were properly qualified under the Uniform Business Record as Evidence Law and were properly admitted.

Point VI is denied.

The judgment of conviction on each of the twelve counts is affirmed.

The motion court's order denying post-conviction relief is affirmed.

All concur.